[No. 1986.]

## J. G. Fuller *v.* The State.

1. **Certiorari — Transcript.**— The record entry of the impaneling of the grand jury which returned the indictment is no part of a transcript on appeal to the court of appeals, and hence a *certiorari* to supply such record will not be awarded.

2. **Theft — Hearsay Evidence.**— See the opinion *in extenso* for evidence held to be hearsay, and therefore to have been improperly admitted.

3 **Same — Accomplice Testimony — Charge of the Court.**— If, upon the trial of a criminal cause, evidence is adduced tending to show that a witness for the State was an accomplice in the perpetration of the offense, it becomes the duty of the trial court to give in charge to the jury the law governing the testimony of accomplices.

APPEAL from the District Court of Navarro. Tried below before J. H. Rice, Esq., Special Judge.

The indictment in this case was joint against the appellant and J. M. Fuller. It charged them with the theft of two yearlings, one the property of T. C. Sparks, and the other the property of Mrs. A. Tickle, in Navarro county, Texas, on the 15th day of April, 1883. A severance having been awarded, the appellant was first placed upon trial and was convicted, his punishment being affixed at a term of two years in the penitentiary.

T. C. Sparks was the first witness for the State. He testified that he knew the defendant, but, as he and his brother, J. M. Fuller, sitting together were so strikingly alike, witness could not point him out in court. During the year 1883 the witness, who was engaged in the stock-trading business, was in Navarro county purchasing yearlings. On or about March 20, 1883, witness's brother, John C. Sparks, bought a black bull yearling from Mrs. A. Tickle. Some time after that purchase the witness met Latch Dew in Corsicana, who told him that he had six head of yearlings to sell. Witness sent his brother, John C. Sparks, to look at them, and John C. bought them for him. J. C. Sparks took those yearlings to witness's pasture on the following evening. When they were turned into the pasture John C. Sparks directed witness's attention particularly to a certain black bull yearling, unmarked and unbranded. That yearling disappeared from witness's pasture about ten days later, since when the witness had neither seen nor heard of it. Before the disappearance of that yearling Latch Dew and George and Joe Tickle identified it. George Tickle came to witness's pasture and picked it out of about three hundred head, as the yearling his mother had sold to J. C. Sparks. The black yearling was purchased from Mrs. Tickle about March 20, 1883, and the six head were purchased from Latch Dew about two weeks later. B. T. Barry was present when Latch Dew identified the yearling. That animal had no white marks or spots on it that witness could remember.

Cross-examined, the witness stated that the black yearling identified by Latch Dew and Tickle was the same animal to which his attention had previously been particularly called by John C. Sparks. As John C. Sparks drove the several yearlings into the pasture, he pointed the black bull yearling out to witness and remarked: "That is the yearling I bought from Mrs. Tickle, and paid for." John C. Sparks was buying yearlings for the witness, with witness's means, to fill a contract which the witness had.

Latch Dew was the next witness for the State. He testified that

in the spring of 1883, he, the defendant, and J. M. Fuller drove six yearlings to Corsicana to sell. The Fullers brought three yearlings and one cow to the witness's house, between 7 and 8 o'clock one morning. One of the animals was a "yo-necked" black bull yearling with some white spots on the neck and flanks, and some white "shot" in the forehead. About half of the tail was also white. The yearling thus described was neither marked nor branded. The other two yearlings were branded 9 y 9. The Fullers requested witness to sell their yearlings with his, as they would, doubtless, bring more sold together, and as witness had previously succeeded in selling for more than they had, and could probably do so again. Witness and the Fullers drove six yearlings to town, three of which belonged to witness. They went first to Haley and then to T. C. Sparks to sell them. John C. Sparks went with the witness to inspect the animals and bought them. Witness executed to John C. Sparks a bill of sale to the six yearlings. One of the Fuller boys went with witness and Sparks to look at the cattle. Witness, however, could not recollect whether or not he was attended by either of the Fullers when he went to offer the animals to Sparks. The Fullers told witness that the three yearlings belonged to them, and when the witness cashed the draft given him by Sparks, which he did that evening at Garrity's bank, he paid them $12.50 a head for them. The animals were delivered by witness and one of the Fullers to J. C. Sparks, in Haley's pasture. A week or ten days elapsed before the witness heard anything more of the yearlings. At the end of that time, witness went to Haley's pasture, in which Sparks had some two hundred or three hundred head of cattle, and found among them the black bull yearling which he had sold to Jno. C. Sparks for the Fullers, and identified it. T. C. Sparks and B. F. Barry were present. Witness did nothing but repay to J. C. Sparks the money which he had paid for the animals. Witness afterwards went to see Mr. Fuller about the money part of the transaction, and Fuller said that the yearling was his. On the night of the day on which witness repaid the purchase money to J. C. Sparks, witness and said Sparks got Jim Tickle and went to the house of the Fullers to arrest them for the theft of the black bull yearling. It was after the killing of John C. Sparks that the witness looked at the cattle in Haley's pasture. Witness was present when John C. Sparks was killed. Jim Pitman was also present when John C. Sparks was killed. The witness did not know that the Fuller boys had been told what they were to be arrested for, before the night Sparks was killed.

Cross-examined, the witness said that John C. Sparks, so far as

he knew, had no warrant for the arrest of the Fuller boys. He did not know whether or not Sparks was an officer. Witness testified at the examining trial of the Fullers for killing Sparks. The Fullers were discharged by the magistrate who held that examining trial. When the witness went to the Fullers and told them that some other parties were claiming the ownership of the black yearling, they said that the animal belonged to them, and that they could show the mother of it. This was some time after Sparks was killed. Mrs. Fuller, the mother of the defendant, owned quite a considerable number of cattle, but witness did not know that the black yearling described had ever sucked one of her cows. The Fullers cut the yearling off from the cow they drove to witness's house on the morning of the sale to Sparks. They claimed the cow as their mother's property. Witness did not remember that, when he sold the yearlings to Sparks, he said anything about the Fullers owning any part of them. John C. Sparks went to the pasture, when the trade was made, with Littleman Fuller and witness. On returning to town witness made the bill of sale to Sparks in his own name only. He then paid Benjamin Fuller the money due on the three yearlings, and Benjamin Fuller divided his share with Littleman Fuller. The Fullers and witness agreed on the day before the sale that they would go to town together, assisting each other to drive and dispose of the cattle. Witness lived about three miles from the Fullers, and had often seen their cattle on the range. Witness denied that at Mrs. Fuller's house, shortly after the sale to Sparks, he told Jeff Gamble that he had seen the black yearling sucking Mrs. Fuller's cow. On the contrary, he told Gamble that he had not.

Re-examined, the witness stated that the Fullers had some difficulty in separating the cow from the yearlings. Witness had never seen that cow before or since. He did not know of which, if either, of the three yearlings she was the mother, as he did not see either of the three sucking her.

George Tickle testified, for the State, that he was the son of Mrs. A. Tickle. The animal which Mrs. Tickle sold to John C. Sparks was a small " yo-necked " black bull yearling, with some white on its loins. Mrs. Tickle sold that animal to Sparks in April, 1883. Mr. Sparks came to Mrs. Tickle's for the yearling about the 6th of April, but failed to find it. Mr. Sparks was killed on that same night. The mother of the yearling sold by Mrs. Tickle to John C. Sparks was now the property of witness. About a week after John C. Sparks came after the yearling, witness saw it in T. C. Sparks's

pasture and identified it. Witness at once recognized it among perhaps two hundred and fifty other head of cattle. Witness and his mother helped Sparks hunt for that animal while it was missing. Mrs. Tickle had been milking the yearling's mother about ten months when she sold the yearling to Sparks. Witness had not seen that yearling since he saw and identified it in T. C. Sparks's pasture.

Cross-examined, the witness stated that the animal was being kept up at the time it was sold to Sparks, but was turned out by Joe Tickle before it was delivered. It was neither marked nor branded. The only white about the yearling was a little on its loins. It was, perhaps, a little frosty on the tail.

Mrs. Amelia Tickle testified, for the State, that, on or about March 1, 1883, she sold a black yearling bull to Mr. John C. Sparks, executing her bill of sale thereto on the 5th day of the same month. If the Fullers took that yearling, they took it without the witness's consent. Sparks paid witness for the yearling when he bought it, but left the animal with witness to be kept and delivered to him about the 15th of the same month. Witness directed her boys to keep the yearling up, but by some oversight it was turned out and had never been seen since by the witness. Witness owned and milked the mother of the yearling. She had since sold two cows very much alike, one to Mr. Brittain and one to her son George. She did not know which of these two parties bought the mother of the animal. Witness's boys managed her cattle, which she seldom saw, and they knew more about them than she did. When Sparks came to get the yearling he had bought it was not to be found on witness's place — had been turned out,— and witness sent her sons George and James to look for it.

Cross-examined, the witness said that after it was turned out the yearling was for a time about the place of her brother-in-law, Henry Black. Witness directed her sons not to brand the yearling, as she had sold it to Mr. Sparks. Witness sold a large "yo-necked" cow to Mr. Brittain. The few white spots on the loins of the yearling were discernible only upon close inspection. The yearling was in the pen when sold to Sparks, and witness went with Sparks to the pen and pointed it out. The boys afterwards turned all of witness's yearlings into the field, and subsequently turned them out of the field. Witness had not missed the yearling when Sparks came for it, nor did she learn until that time that it had been turned out. Witness identified the bill of sale in evidence as the one that she executed to John C. Sparks.

T. C. Sparks was recalled and testified, for the State, that he recognized the small book of bills of sale as the one which he gave his brother, John C. Sparks, to use in purchasing stock, which said book was found upon the body of J. C. Sparks after his death. It contained the bills of sale executed by Mrs. Tickle and Latch Dew to J. C. Sparks. The bill of sale from Mrs. Tickle reads as follows:
" STATE OF TEXAS, ⎫
   *County of Navarro.* ⎰
"For and in consideration of $10, to me in hand paid, I have sold and agree to deliver to J. C. Sparks by 15 April, A. D. 1883, one male black yearling, not marked or branded. This 6th March, 1883.
                                        Her
                    " M. A.  ⋈  TICKLE. "
                                       mark.
Witness further testified that he was buying cattle under contract for B. Gatewood, Frost & Barry.

Cross-examined, the witness stated that Latch Dew did not repay him any money. Witness was getting the cattle together for Gatewood, Frost & Barry, who furnished the witness the money to buy with. The witness first saw the black yearling when it was placed in the pasture, which was on the day after it was purchased by John C. Sparks from Mrs. Tickle. Witness was operating on the money of other parties and was paying his brother to act for him, by the day. He, after his brother's death, gathered the stock purchased according to the bill of sales book, the bills in which were all written by his brother.

Latch Dew, recalled for the State, testified that he executed the bill of sale to John C. Sparks, in the bank in Corsicana, and was of impression that Fuller signed it as a witness. That bill of sale conveyed six yearlings, four male and two female; two were branded 9 y 9, one L. D., and three were unbranded. The bill of sale referred to, being in the usual form, was then read in evidence.

Cross-examined, the witness said that shortly after the sale to John C. Sparks, he, John C. Sparks, came to him and demanded repayment for the black yearling, and may have threatened him with prosecution for stealing it. Witness repaid the purchase money of the animal to the said John C. Sparks. On the night of that same day, witness went with John C. Sparks and attempted to arrest the Fullers. Witness saw the Fullers, a few days after their examining trial for the murder of Sparks, and demanded that they refund him the purchase money of the yearling, and they refused, claiming that the animal belonged to them. State closed.

Jeff Gamble was the first witness for the defense. He testified

that, some time in the spring of 1883, when he was engaged milking in his cow pen, he saw "them" at Mrs. Fuller's turn out four or five yearlings. He was not near enough to be able to give a more perfect description of the animals turned out than that they were dark colored yearlings. A muley cow, owned by Mrs. Fuller, was driven off with the yearlings. The witness knew that cow to belong to Mrs. Fuller, because, when in the employ of Mrs. Fuller, he had milked that cow for her. The witness did not know whether or not the cow was the mother of any of the yearlings. "They" (Latch Dew and the Fullers?) said that they were going to take the animals to town. After the trouble about the black yearling arose, Latch Dew told the witness that he believed the said yearling to be Mrs. Fuller's, and knew that the cow was hers. Dew and witness were alone when Dew first made this statement, and then the witness called William Black's attention to it. The statement grew out of a conversation about the yearling that Mrs. Tickle sold to Sparks, being the same that Dew sold to Sparks. The conversation occurred on the Sunday following Sparks's death. Dew said in substance that the yearling sold by him to Sparks was Mrs. Fuller's, but Sparks thought it was the yearling he had previously bought from Mrs. Tickle, and that the Fuller boys stole it from Mrs. Tickle's place and sold it to him; that the separation of the cow and the yearling was the hardest task of the kind he had ever experienced. Witness's mother and Mrs. Fuller were cousins.

Mrs. Fuller, the mother of the defendant, testified for the defense that she saw the defendant and his brother when they started to Corsicana with the animals described by preceding witnesses. She owned those animals and sent them by her sons to town to sell, in order to get money to pay her taxes with. One of the three animals was a black yearling with some white spots on its head, back and loins, and half of its tail was white. That yearling was the calf of an old muley cow owned by the witness, which was popularly known in the neighborhood as "Old Alabama." Witness was at the pen when the boys started to town with the yearlings. "Old Alabama" was standing outside the pen, lowing for the black yearling, and joined them when turned out of the pen, and she was driven off with them, the boys saying they would cut her out as soon as possible. The witness had never seen the yearling since, and never heard of it being claimed by Mrs. Tickle until the night that John C. Sparks and the Tickle boys came to witness's house to arrest her boys for the theft of that animal. Witness heard Latch Dew tell Jeff Gamble that he saw the yearling in question sucking witness's cow, and that he knew that yearling to belong to witness.

Cross-examined, the witness testified that she knew the yearling well. It was not branded when it left home in charge of the boys for the Corsicana market. The other two yearlings were branded, but the witness could not recall their brands. She did not raise them. They were animals lost by a drover the fall prior to the time they were driven to market. The chance of recovery of them was bought by witness, and they were found by her sons.

Walter Fuller testified that he was a brother to the defendant, and was present at the cow pen when defendant and his brother started from home with the yearlings to the Corsicana market. They took three yearlings and a cow. The cow was taken along to expedite the driving of the yearlings until they should reach Latch Dew's. The only unbranded yearling was a "yo-necked" black bull, white line-back and white belly, some white on the flanks, white spot in the forehead and tail about half white. Witness's mother owned the yearling and the cow. The cow was the yearling's mother. The cow was a blue spotted muley animal. Witness did not go to town with his brothers and the yearlings, and never saw the little bull after it was driven to town. Witness was present and heard Latch Dew tell Gamble that he had seen the black bull yearling sucking witness's mother's cow, and that he had never before had so much trouble in separating a cow and calf. The first the witness ever heard of an adverse claim to the yearling was when John C. Sparks came to Mrs. Fuller's to arrest his brothers for stealing it, and was killed. The cow and yearlings were turned out of the pen together.

Cross-examined, the witness said that he positively knew that the three yearlings taken to town and sold to Sparks belonged to his mother. He knew that his mother raised them all, and that she still had the mothers of all of them at home. "Witness being further questioned, hesitated, and said that his mother raised all of the yearlings. When asked again about the two branded yearlings, he said that his mother had owned their mothers, and on being asked what had become of their mothers now, failed to answer at all." John Sparks, Latch and John Dew and Jim Tickle came to Mrs. Fuller's the night Sparks was killed.

Henry Black testified, for the defense, that both Mrs. Fuller and Mrs. Tickle were his sisters-in-law. Witness saw the yearling Mrs. Tickle claimed to have sold to Sparks after it was turned out by the Tickles in the spring of 1883. That yearling, for several weeks, lay at night in front of witness's gate. He was a black bull yearling in poor condition. That animal and another one of Mrs. Tickle's yearlings

that was branded came to witness's house together. Joe Tickle came to witness's house, hunting that yearling, the week after it was said the Fuller boys and Latch Dew sold it to Sparks. That animal was an unbranded and unmarked black bull yearling, with possibly a little white in the forehead. Witness could not say exactly how long before Joe Tickle came hunting it, it disappeared, but it slept about witness's place from one to three weeks. Witness had never seen it since it quit sleeping on his place. Joe Tickle's search for the yearling was made after the death of John C. Sparks. Witness knew nothing of a black bull yearling belonging to Mrs. Fuller.

T. C. Sparks, for the State, in rebuttal testified that Joe Tickle came to his pasture and picked out the same yearling that was identified by Jim Tickle and Latch Dew.

The motion for new trial raised the questions discussed in the opinion.

*Read, Greer & Greer*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

Willson, Judge. I. Appellant suggests a diminution of the record in this case, and asks for a *certiorari* to bring up a more perfect record. The diminution suggested is that the record does not show the impaneling of the grand jury that returned the indictment into court. We must refuse to grant the motion for the *certiorari*. In making up a transcript in a criminal cause on appeal, the record of the organization of the grand jury does not constitute a portion of the record in the case essential or proper to be included in the transcript. It is not a proceeding in the cause to be brought before this court on appeal, and hence it would not be proper to order it to be brought up by *certiorari*. (Dist. Court Rules, Nos. 110, 111, 112, 113; 2 Texas Ct. App., 678.)

II. On the trial of the case, the State was permitted, over the objections of the defendant, and to which ruling of the court there is a proper bill of exception, to prove that John C. Sparks and Joe Tickle, both of whom were dead, went to the pasture of T. C. Sparks and there saw and identified the yearling in controversy, and picked it out from among some three hundred other yearlings in the pasture, saying it was the identical yearling which Mrs. A. Tickle had sold to John C. Sparks, acting as the agent for T. C. Sparks. This testimony was important and material, the principal issue in the case being the identity of the yearling so sold by Mrs.

Tickle to Sparks, with a yearling sold by the defendant to said Sparks, it being testified to by other witnesses that said yearling was the identical one which defendant, through one Latch Dew, had sold and delivered to said Sparks. It directly connected the defendant with the theft of Mrs. Tickle's yearling. We are clearly of the opinion that this testimony was hearsay and inadmissible against the defendant for any purpose. (*Anderson* v. *The State,* 14 Texas Ct. App., 49.)

III. There was evidence, we think, which tended to show that the State's witness Latch Dew was an accomplice in the theft of the yearling, if a theft had in fact been committed. Such being the case the court should have properly instructed the jury as to the law governing the testimony of an accomplice. Such instruction was not given the jury, although defendant's counsel requested a special charge upon the subject, which, while the court may have been justified in refusing to give it, because incorrectly drawn, was nevertheless sufficient to call the attention of the court to the issue and to the omission to present it in the general charge.

Because of the errors above noticed the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered November 18, 1885.]